# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| Farnam Street Financial, Inc., a Minnesota corporation,<br><br>Plaintiff,<br><br>v.<br><br>Safe & Green Holdings Corp., a Delaware corporation,<br><br>Defendant. | Civil Action No. _____<br><br><br><br>**COMPLAINT** |

For its Complaint against Defendant Safe & Green Holdings Corp. ("Defendant"), Plaintiff Farnam Street Financial, Inc. ("Farnam Street") states and alleges as follows:

## THE PARTIES

1.      Farnam Street is a Minnesota corporation with its corporate headquarters and principal place of business located in Hennepin County, Minnesota at 5850 Opus Parkway, Minnetonka, Minnesota 55343.  Farnam Street is engaged in the business of equipment leasing.

2.      Safe & Green Holdings Corp. is a Delaware corporation, with its principal place of business located in Florida.  Safe & Green Holdings Corp. was formerly known as SG Blocks, Inc.

## JURISDICTION AND VENUE

3.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because (i) there exists complete diversity of citizenship between Farnam

Street, a citizen of Minnesota, and Defendant, a citizen of Delaware and Florida, and (ii) the amount in controversy exceeds the sum of $75,000.00, exclusive of costs and interest.

4.    Venue is also proper in this district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

5.    In October 2021, Farnam Street and Defendant entered into an equipment lease agreement identified as Lease Agreement Number SG101321 ("Lease Agreement"), a true and correct copy of which is attached hereto as **Exhibit A**.

6.    In connection with the Lease Agreement, Farnam Street and Defendant executed Lease Schedule No. 001 ("Schedule 1"; together with the Lease Agreement, the "Lease"), a true and correct copy of which is attached hereto as **Exhibit B**.

7.    Pursuant to the terms of Schedule 1, Farnam Street and Defendant committed to leasing $2,000,000.00 worth of equipment ("Commitment") for an initial term of 24 months. Defendant is obligated to select and install equipment necessary to meet the Commitment. In exchange, Defendant agreed to, among other things, pay "Monthly Lease Charges" to Farnam Street, plus applicable taxes, on the first of each month of Schedule 1's term.

8.    Pursuant to its terms and absent Farnam Street's agreement otherwise, Schedule 1's 24-month initial term does not commence until Defendant satisfies its Commitment.

9.      Defendant has only accepted and installed $1,556,163.00 worth of equipment (the "Equipment") and therefore has not satisfied its Commitment and Schedule 1 has not yet commenced.

10.     Until such time as Schedule 1 commences, the Lease Agreement provides that the Monthly Lease Charge "will be prorated and charged as interim rent" from the date a piece of equipment is installed until the commencement date of Schedule 1.

11.     Defendant has remained obligated to pay interim rent to Farnam Street based on the amount of Equipment selected and installed by Defendant.  The current monthly interim rent amount is $72,057.30, inclusive of sales and use taxes.

12.     Pursuant to Paragraph 16(1) of the Lease Agreement, non-payment of any sum required to be paid by Defendant within ten (10) days from the due date is defined as an "Event of Default" under the Lease Agreement.

13.     Defendant has caused multiple Events of Default by failing to pay Monthly Lease Charges within ten (10) days from when such charges become due.

14.     Pursuant to Paragraph 17 of the Lease Agreement, as a result of the Events of Default caused by Defendant, Farnam Street is entitled to: (i) recover all accrued and unpaid lease charges and other amounts due and owing under the Lease, (ii) accelerate and recover the present value of future lease charges and other amounts likely to become due under the Lease; (iii) recover the Casualty Loss Value (as defined in the Lease Agreement) of the Equipment; and (iv) recover the Equipment.

15.     Defendant is obligated to pay Farnam Street for all costs, expenses, and fees (including attorneys' fees) incurred by Farnam Street in seeking to enforce its rights and

remedies resulting from the Events of Default. Farnam Street has incurred and continues to incur costs, expenses, and attorneys' fees as a result of Defendant's Events of Default.

16.     Farnam Street is also entitled to recover Late Charges (as defined in the Lease Agreement) computed on any past due amount on the date such payment is due and every thirty (30) days thereafter until all past due amounts are paid in full.

17.     As of October 16, 2023, the total amount recoverable by Farnam Street from Defendant under the Lease is $2,086,185.06, plus Farnam Street's costs, expenses, and fees (including attorneys' fees).

## COUNT I
## BREACH OF CONTRACT

18.     Farnam Street realleges and incorporates by reference each of the preceding paragraphs of this Complaint as if fully restated herein.

19.     Defendant has failed to pay Monthly Lease Charges in accordance with the terms of the Lease. Such nonpayment has lasted for more than ten (10) days since the applicable due dates, thus constituting an Event of Default and breach of the Lease.

20.     Defendant's breach of the Lease is the cause of damages to Farnam Street, entitling it to the relief provided for in the Lease and as set forth below, including recovery of all amounts owed under the Lease Agreement and Schedule 1.

## COUNT II
## REPLEVIN

21.     Farnam Street realleges and incorporates by reference each of the preceding paragraphs of this Complaint as if fully restated herein.

22.     Farnam Street leased the Equipment to Defendant pursuant to the Lease Agreement and Schedule 1.

23.     At all times relevant hereto, the Equipment has been, and remains, the sole and exclusive property of Farnam Street.

24.     The Lease provides that Farnam Street is entitled to recover possession of its Equipment upon the occurrence of an Event of Default.

25.     Defendant committed multiple Events of Default by failing to pay Monthly Lease Charges when due, thereby entitling Farnam Street to prejudgment recovery and possession of its Equipment.

## REQUEST FOR RELIEF

WHEREFORE, Farnam Street prays for judgment as follows:

1.     Awarding damages in the total amount of $2,086,185.06, plus other amounts due under the Lease Agreement and Schedule 1 in favor of Farnam Street and against Defendant.

2.     Awarding prejudgment interest in favor of Farnam Street and against Defendant at the maximum rate allowed by law;

3.     Awarding Farnam Street its costs, expenses, and fees (including attorneys' fees) incurred in pursuing this action and in dealing with the Events of Default committed by Defendant, as provided for in the Lease Agreement, and as otherwise allowed by law;

4.     Ordering Defendant to return the Equipment to Farnam Street; and

5.     Awarding Farnam Street such other relief as the Court deems just and equitable.

Dated: October 17, 2023

      *s/ Phillip J. Ashfield*

Phillip J. Ashfield (#0388990)
Kevin P. Kitchen (#0399297)
**STINSON LLP**
50 South Sixth Street, Suite 2600
Minneapolis, Minnesota 55402
Telephone: (612) 335-1500
Phillip.Ashfield@stinson.com
Kevin.Kitchen@stinson.com

**ATTORNEYS FOR FARNAM STREET
FINANCIAL, INC.**

# EXHIBIT A

**Farnam Street**
FINANCIAL

OCT 2 8 2021

**Lease Agreement Number SG101321**

# LEASE AGREEMENT

This Lease Agreement, dated October 13, 2021 by and between **FARNAM STREET FINANCIAL, INC.** (the "Lessor") with an office located at 5850 Opus Parkway, Suite 240, Minnetonka, MN 55343 and **SG BLOCKS, INC.** (the "Lessee") with an office located at 17 State Street, 19th Floor, New York, NY 10004.

Lessor hereby leases or grants to the Lessee the right to use and Lessee hereby rents and accepts the right to use the equipment (identified by serial number where serialized), services, and software on the Lease Schedule(s) attached hereto or incorporated herein by reference from time to time (collectively, the equipment, software and services are the "Equipment"), subject to the terms and conditions hereof, as supplemented with respect to each item of Equipment by the terms and conditions set forth in the appropriate Lease Schedule. The term "Lease Agreement" shall include this Lease Agreement and the various Lease Schedule(s) identifying each item of Equipment or the appropriate Lease Schedule(s) identifying one or more particular items of Equipment.

**1. TERM:** This Lease Agreement is effective from the date it is executed by both parties. The term of this Lease Agreement, as to all Equipment designated on any particular Lease Schedule, shall commence on the Installation Date for all Equipment on such Lease Schedule and shall continue for an initial period ending that number of months from the Commencement Date as set forth in such Lease Schedule (the "Initial Term") and shall continue from year to year thereafter until terminated. The term of this Lease Agreement as to all Equipment designated on any particular Lease Schedule may be terminated without cause at the end of the Initial Term or any year thereafter by either party mailing written notice of its termination to the other party not less than one-hundred twenty (120) days prior to such termination date.

**2. COMMENCEMENT DATE:** The Installation Date for each item of Equipment shall be the day said item of Equipment is installed at the Location of Installation, ready for use, and accepted in writing by the Lessee. The Commencement Date for any Lease Schedule is the first of the month following installation of all the Equipment on the Lease Schedule, unless the latest Installation Date for any Equipment on the Lease Schedule falls on the first day of the month in which case that is the Commencement Date. The Lessee agrees to complete, execute and deliver a Certificate(s) of Acceptance to Lessor upon installation of the Equipment.

**3. LEASE CHARGE:** The lease charges for the Equipment leased pursuant to this Lease Agreement shall be the aggregate "Monthly Lease Charge(s)" as set forth on each and every Lease Schedule executed pursuant hereto (the aggregate "Monthly Lease Charge(s)" are the "Lease Charges"). Lessee agrees to pay to Lessor the Lease Charges in accordance with the Lease Schedule(s), and the payments shall be made at Lessor's address indicated thereon. The Lease Charges shall be paid by Lessee monthly in advance with the first full month's payment due on the Commencement Date. If the Installation Date does not fall on the first day of a month, the Lease Charge for the period from the Installation Date to the Commencement Date shall be an amount equal to the "Monthly Lease Charge" divided by thirty (30) and multiplied by the number of days from and including the Installation Date to the Commencement Date and such amount shall be due and payable upon receipt of an invoice from Lessor. Charges for taxes made in accordance with Section 4 and charges made under any other provision of this Lease Agreement and payable by Lessee shall be paid to Lessor at Lessor's address specified on the Lease Schedule(s) on the date specified in invoices delivered to Lessee. If payment, as specified above, is not received by Lessor on the due date, Lessee agrees to and shall, to the extent permitted by law, pay on demand, as a late charge, an amount equal to one and one-half percent (1½%), or the maximum percentage allowed by law if less, of the amount past due ("Late Charges"). Late Charges shall be charged and added to any past due amount on the date such payment is due and every thirty (30) days thereafter until all past due amounts are paid in full to Lessor.

**4. TAXES:** In addition to the Lease Charges set forth in Section 3, the Lessee shall reimburse Lessor for all license or registration fees, assessments, sales and use taxes, rental taxes, gross receipts taxes, personal property taxes and other taxes now or hereafter imposed by any government, agency, province or otherwise upon the Equipment, the Lease Charges or upon the ownership, leasing, renting, purchase, possession or use of the Equipment, whether the same be assessed to Lessor or Lessee (the "Taxes"). Lessor shall file all property tax returns and pay all Taxes when due. Lessee, upon notice to Lessor, may, in Lessee's own name, contest or protest any Taxes, and Lessor shall honor any such notice except when in Lessor's sole opinion such contest is futile or will cause a levy or lien to arise on the Equipment or cloud Lessor's title thereto. Lessee shall, in addition, be responsible to Lessor for the payment and discharge of any penalties or interest as a result of Lessee's actions or inactions. Nothing herein shall be construed to require Lessee to be responsible for any federal or state taxes or payments in lieu thereof, imposed upon or measured by the net income of Lessor, or state franchise taxes of Lessor, or except as provided hereinabove, any penalties or interest resulting from Lessor's failure to timely remit such tax payments.

**5. DELIVERY AND FREIGHT COSTS:** Lessee shall accept delivery and install the Equipment before such time as the applicable vendor requires payment for such Equipment.

All transportation charges upon the Equipment for delivery to Lessee's designated Location of Installation are to be paid by Lessee. All rigging, drayage charges, structural alterations, rental of heavy equipment and/or other expense necessary to place the Equipment at the Location of Installation are to be promptly paid by Lessee.

**6. INSTALLATION:** Lessee agrees to pay for the actual installation of the Equipment at Lessee's site. Lessee shall make available and agrees to pay for all costs associated with providing a suitable place of installation and necessary electrical power, outlets and air conditioning required for operating the Equipment as defined in the Equipment manufacturer's installation manual or instructions. All supplies consumed or required by the Equipment shall be furnished and paid for by Lessee.

**7. RETURN TO LESSOR:** On the day following the last day of the lease term associated with a Lease Schedule (the "Return Date"), Lessee shall cause and pay for all the Equipment (by serial number where serialized) on that Lease Schedule to be deinstalled, packed using the manufacturer's original packing materials and shipped to the location(s) designated in writing by Lessor (the "Return Location"). If all the Equipment on the applicable Lease Schedule is not at the Return Location within ten (10) days of the Return Date, or Lessee fails to deinstall and ship all the Equipment on the Return Date, then any written notice of termination delivered by Lessee shall become void, and the Lease Schedule shall continue in accordance with this Lease Agreement. Irrespective of any other provision hereof, Lessee will bear

the risk of damage from fire, the elements or otherwise until delivery of the Equipment to the Return Location. At such time as the Equipment is delivered to the Lessor at the Return Location, the Equipment will be at the risk of Lessor. In the case of Equipment that is software or related implementation services, Lessee will erase, delete and destroy all electronic incidents of software, and deliver to Lessor all tangible items constituting software. At Lessor's request, Lessee will also certify in a written form acceptable to Lessor that: (i) all tangible Software has been delivered to Lessor; (ii) all intangible records have been destroyed; (iii) Lessee has not retained the software in any form; (iv) Lessee will not use the Software after the termination date of a Lease Schedule; and (v) Lessee has not received from the software supplier(s) anything of value relating to or in exchange for Lessee's use, rental or possession of the software during the duration of the applicable Lease Schedule (including a trade-in, substitution or upgrade allowance).

**8. MAINTENANCE:** Lessee, at its sole expense, shall maintain the Equipment in good working order and condition. Lessee shall enter into, pay for and maintain in force during the entire term of any Lease Schedule, a maintenance agreement with the original manufacturer of the Equipment providing for continuous uninterrupted maintenance of the Equipment (the "Maintenance Agreement"). Lessee will cause the manufacturer to keep the Equipment in good working order in accordance with the provisions of the Maintenance Agreement and make all necessary adjustments and repairs to the Equipment. The manufacturer is hereby authorized to accept the directions of Lessee with respect thereto. Lessee agrees to allow the manufacturer full and free access to the Equipment. All maintenance and service charges, whether under the Maintenance Agreement or otherwise, and all expenses, if any, of the manufacturer's customer engineers incurred in connection with maintenance and repair services, shall be promptly paid by Lessee. Lessee warrants that all of the Equipment shall be in good working order operating according to manufacturer's specification and eligible for the manufacturer's standard maintenance agreement upon delivery to and inspection and testing by the Lessor. If the Equipment is not operating according to manufacturer's specification, in good working order and/or certified by the manufacturer as eligible for the manufacturer's standard maintenance agreement, Lessee agrees to reimburse Lessor for all costs, losses, expenses and fees associated with such equipment and the repair or replacement thereof.

**9. LOCATION, OWNERSHIP AND USE:** The Equipment shall, at all times, be the sole and exclusive property of Lessor. Lessee shall have no right or property interest therein, except for the right to use the Equipment in the normal operation of its business at the Location of Installation, or as otherwise provided herein. The Equipment is and shall remain personal property even if installed in or attached to real property. Lessor shall be permitted to display notice of its ownership on the Equipment by means of a suitable stencil, label or plaque affixed thereto.

Lessee shall keep the Equipment at all times free and clear from all claims, levies, encumbrances and process. Lessee shall give Lessor immediate notice of any such attachment or other judicial process affecting any of the Equipment. Without Lessor's written permission, Lessee shall not attempt to or actually: (i) pledge, lend, create a security interest in, sublet, exchange, trade, assign, swap, use for an allowance or credit or otherwise; (ii) allow another to use; (iii) part with possession; (iv) dispose of; or (v) remove from the Location of Installation, any item of Equipment. If any item of Equipment is exchanged, assigned, traded, swapped, used for an allowance or credit or otherwise to acquire new or different equipment (the "New Equipment") without Lessor's prior written consent, then all of the New Equipment shall become Equipment owned by Lessor subject to this Lease Agreement and the applicable Lease Schedule.

Any feature(s) installed on the Equipment at the time of delivery that are not specified on the Lease Schedule(s) are and shall remain the sole property of the Lessor.

Lessee shall cause the Equipment to be operated in accordance with the applicable vendor's or manufacturer's manual of instructions by competent and qualified personnel.

**10. FINANCING STATEMENT:** Lessor is hereby authorized by Lessee to cause this Lease Agreement or other instruments, including Uniform Commercial Code Financing Statements, to be filed or recorded for the purposes of showing Lessor's interest in the Equipment. Lessee agrees to execute any such instruments as Lessor may request from time to time.

**11. ALTERATIONS AND ATTACHMENTS:** Upon prior written notice to Lessor, Lessee may, at its own expense, make minor alterations in or add attachments to the Equipment, provided such alterations and attachments shall not interfere with the normal operation of the Equipment and do not otherwise involve the pledge, assignment, exchange, trade or substitution of the Equipment or any component or part thereof. All such alterations and attachments to the Equipment shall become part of the Equipment leased to Lessee and owned by Lessor. If, in Lessor's sole determination, the alteration or attachment reduces the value of the Equipment or interferes with the normal and satisfactory operation or maintenance of any of the Equipment, or creates a safety hazard, Lessee shall, upon notice from Lessor to that effect, promptly remove the alteration or attachment at Lessee's expense and restore the Equipment to the condition the Equipment was in just prior to the alteration or attachment.

**12. LOSS AND DAMAGE:** Lessee shall assume and bear the risk of loss, theft and damage (including any governmental requisition, condemnation or confiscation) to the Equipment and all component parts thereof from any and every cause whatsoever, whether or not covered by insurance. No loss or damage to the Equipment or any component part thereof shall impair any obligation of Lessee under this Lease Agreement, which shall continue in full force and effect except as hereinafter expressly provided. Lessee shall repair or cause to be repaired all damage to the Equipment. In the event that all or part of the Equipment shall, as a result of any cause whatsoever, become lost, stolen, destroyed, depleted or otherwise rendered irreparably unusable, damaged or consumed, which shall include Equipment that would be rendered unusable by the act of deinstalling for return to Lessor (e.g. leasehold improvements of real estate etc.) (collectively, the "Loss") then Lessee shall, within ten (10) days after the Loss, fully inform Lessor in writing of such a Loss and shall pay to Lessor the following amounts: (i) the Monthly Lease Charges (and other amounts) then due and owing under this Lease Agreement, plus (ii) one-hundred (100%) percent of the original cost of the Equipment subject to the Loss if the loss occurs in either the installation period or during the first nine months of the Initial Term, and, thereafter, the original cost of the Equipment amortized by the subsequent Monthly Lease Charges received by Lessor during the Initial Term using an amortization rate of eight hundred and ninety (890) basis points over the interest rate of the three (3) year United States Treasury Note as reported by the Federal Reserve on the Commencement Date (collectively, the sum of (i) plus (ii) shall be the "Casualty Loss Value"). If the Loss occurs after the Initial Term, (ii) above shall be the remaining unamortized balance as of the end of the Initial Term without further amortization (the "Terminal Casualty Loss Value"). Notwithstanding the foregoing, if Lessee has provided notice to terminate the applicable Lease Schedule prior to informing Lessor in writing of a Loss and such Loss is not covered by insurance proceeds pursuant to Section 13 hereof, then Lessee shall pay two (2) times the Casualty Loss Value on the Equipment subject to such Loss. Upon receipt by Lessor of the Casualty Loss Value: (i) the applicable Equipment shall be removed from the Lease Schedule; and (ii) Lessee's obligation to pay Lease Charges associated with the applicable Equipment shall cease. Lessor may request, and Lessee shall complete, an affidavit(s) that swears out the facts supporting the Loss of any item of Equipment.

**13. INSURANCE:** Until the Equipment is returned to Lessor or as otherwise herein provided, whether or not this Lease Agreement has terminated as to the Equipment, Lessee, at its expense, shall maintain: (i) property and casualty insurance insuring the Equipment for its Casualty Loss Value naming Lessor or its assigns as sole loss payee; and (ii) comprehensive public liability and third-party property insurance naming Lessor and its assigns as additional loss payees. The

insurance shall cover the interest of both the Lessor and Lessee in the Equipment, or as the case may be, shall protect both the Lessor and Lessee in respect to all risks arising out of the condition, delivery, installation, maintenance, use or operation of the Equipment. All such insurance shall provide for thirty (30) days prior written notice to Lessor of cancellation, restriction, or reduction of coverage. Lessee hereby irrevocably appoints Lessor as Lessee's attorney-in-fact to make claim for, receive payment of and execute and endorse all documents, checks or drafts for loss or damage or return premium under any insurance policy issued on the Equipment. Prior to installation of the Equipment, all policies or certificates of insurance shall be delivered to Lessor by Lessee. Lessee agrees to keep the Equipment insured with an insurance company which is at least "A" rated by A.M. Best. The proceeds of any loss or damage insurance shall be payable to Lessor, but Lessor shall remit all such insurance proceeds to Lessee at such time as Lessee either (i) provides Lessor satisfactory proof that the damage has been repaired and the Equipment has been restored to good working order and condition or (ii) pays to Lessor the Casualty Loss Value. It is understood and agreed that any payments made by Lessee or its insurance carrier for loss or damage of any kind whatsoever to the Equipment are not made as accelerated rental payments or adjustments of rental, but are made solely as indemnity to Lessor for loss or damage of its Equipment.

**14. ENFORCEMENT OF WARRANTIES:** Upon receipt of a written request from Lessee, Lessor shall, so long as this Lease Agreement is in force, take all reasonable action requested by Lessee to enforce the Equipment manufacturer's warranties, expressed or implied, issued on or applicable to the Equipment, which are enforceable by Lessor in its own name. Lessor shall obtain for Lessee all service furnished by manufacturer in connection therewith; provided, however, that Lessor shall not be required to commence any suit or action or resort to litigation to enforce any such warranty unless Lessee shall first pay to Lessor in advance all expenses in connection therewith, including attorney's' fees.

If any such warranty shall be enforceable by Lessee in its own name, Lessee shall, upon receipt of written request from Lessor, so long as this Lease Agreement is in force, take all reasonable action requested by Lessor to enforce any such warranty, which is enforceable by Lessee in its own name; provided, however, that Lessee shall not be obligated to commence any suit or action or resort to litigation to enforce any such warranty unless Lessor shall pay all expenses in connection therewith.

**15. WARRANTIES, DISCLAIMERS AND INDEMNITY:** THE LESSOR DOES NOT MAKE ANY WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING THE WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. LESSEE ACKNOWLEDGES THAT IT IS NOT RELYING ON LESSOR'S SKILL OR JUDGEMENT TO SELECT OR FURNISH GOODS SUITABLE FOR ANY PARTICULAR PURPOSE AND THAT THERE ARE NO WARRANTIES CONTAINED IN THIS LEASE AGREEMENT. LESSEE ACKNOWLEDGES AND AGREES THAT LESSOR HAS NOT MADE ANY STATEMENT, REPRESENTATION OR WARRANTY RELATIVE TO THE ACCOUNTING OR TAX ENTRIES, TREATMENT, BENEFIT, USE OR CLASSIFICATION OF THE LEASE AGREEMENT OR ASSOCIATED LEASE SCHEDULES. LESSEE ACKNOWLEDGES THAT IT AND/OR ITS INDEPENDENT ACCOUNTANTS ARE SOLELY RESPONSIBLE FOR (i) ANY AND ALL OF LESSEE'S ACCOUNTING AND TAX ENTRIES ASSOCIATED WITH THE LEASE AGREEMENT AND/OR THE LEASE SCHEDULES AND (ii) THE ACCOUNTING AND TAX TREATMENT, BENEFITS, USES AND CLASSIFICATION OF THE LEASE AGREEMENT OR ANY LEASE SCHEDULE. LESSOR SHALL NOT BE LIABLE FOR DAMAGES, INCLUDING SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE PERFORMANCE OF THE EQUIPMENT OR ITS USE BY LESSEE, AND SHALL NOT BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR

CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH LESSOR'S FAILURE TO PERFORM ITS OBLIGATION HEREUNDER. THIS LEASE AGREEMENT IS A "FINANCE LEASE" AS THAT TERM IS DEFINED AND USED IN ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE. NO RIGHTS OR REMEDIES REFERRED TO IN ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE WILL BE CONFERRED ON LESSEE.

Lessee agrees that Lessor shall not be liable to Lessee for, and Lessee shall indemnify, defend and hold Lessor harmless with respect to, any claim from a third party for any liability, claim, loss, damage or expense of any kind or nature, whether based upon a theory of strict liability or otherwise, caused, directly or indirectly, by: (i) the inadequacy of any item of Equipment, including software, for any purpose; (ii) any deficiency or any latent or other defects in any Equipment, including software, whether or not detectable by Lessee; (iii) the selection, manufacture, rejection, ownership, lease, possession, maintenance, operation, use or performance of any item of Equipment, including software; (iv) any interruption or loss of service, use or performance of any item of Equipment, including software; (v) patent, trademark or copyright infringement; or (vi) any loss of business or other special, incidental or consequential damages whether or not resulting from any of the foregoing. Lessee's duty to defend and indemnify Lessor shall survive the expiration, termination, cancellation or assignment of this Lease Agreement or a Lease Schedule and shall be binding upon Lessee's successors and permitted assigns.

**16. EVENT OF DEFAULT:** The occurrence of any of the following events shall constitute an Event of Default under this Lease Agreement and/or any Lease Schedule:

(1) the nonpayment by Lessee of any Lease Charges when due, or the nonpayment by Lessee of any other sum required hereunder to be paid by Lessee which non-payment continues for a period of ten (10) days from the date when due;

(2) the failure of Lessee to perform any other term, covenant or condition of this Lease Agreement, any Lease Schedule or any other document, agreement or instrument executed pursuant hereto or in connection herewith, which is not cured within ten (10) days;

(3) Lessee attempts to or does remove, transfer, sell, swap, assign, sublease, trade, exchange, encumber, receive an allowance or credit for, or part with possession of, any item of Equipment;

(4) Lessee or any guarantor of this Lease Agreement ceases doing business as a going concern, is insolvent, makes an assignment for the benefit of creditors, fails to pay its debts as they become due, offers a settlement to creditors or calls a meeting of creditors for any such purpose, files a voluntary petition in bankruptcy, is subject to an involuntary petition in bankruptcy, is adjudicated bankrupt or insolvent, files or has filed against it a petition seeking any reorganization, arrangement or composition, under any present or future statute, law or regulation;

(5) without Lessor's express prior written consent, (i) Lessee or any guarantor of this Lease Agreement sells, conveys, leases, exchanges or transfers all or substantially all of its assets, (ii) Lessee or any guarantor of this Lease Agreement merges, consolidates, liquidates, dissolves or combines its assets with any other entity, or (iii) if Lessee or any guarantor of this Lease Agreement is a corporation, partnership, limited liability company or other entity, more than 50% of the outstanding equity interests of Lessee or such guarantor are owned directly or indirectly at any time during the Term of this Lease Agreement by a person or group of persons other than the person(s) who held all of the outstanding equity interests on the date of this Lease Agreement;

(6) any representations or warranties made at any time by Lessee or any guarantor in this Lease Agreement or in any agreement, statement, certificate, financial or credit information provided in connection herewith are false or misleading when made;

(7) Lessee or any guarantor of this Lease Agreement defaults under or otherwise has accelerated any material obligation, credit

agreement, loan agreement, conditional sales contract, lease, indenture or debenture; or Lessee or any guarantor of this Lease Agreement defaults under any other agreement now existing or hereafter made with Lessor, including an Equipment Purchase Agreement; or

(8) the breach or repudiation by any party thereto of any guaranty, subordination agreement or other agreement running in favor of Lessor obtained in connection with this Lease Agreement.

**17. REMEDIES:** Should any Event of Default occur and be continuing, Lessor may, in order to protect its interests and reasonably expected profits, with or without notice or demand upon Lessee, pursue and enforce, alternatively, successively and/or concurrently, any one or more of the following remedies:

(1) recover from Lessee all accrued and unpaid Lease Charges and other amounts due and owing on the date of the default;

(2) recover from Lessee from time to time all Lease Charges and other amounts as and when becoming due hereunder;

(3) accelerate, cause to become immediately due and recover the present value of all Lease Charges and other amounts due and/or likely to become due hereunder from the date of the default to the end of the lease term using a discount rate of three (3%) percent;

(4) cause to become immediately due and payable and recover from Lessee the Casualty Loss Value of the Equipment;

(5) terminate any or all of the Lessee's rights, but not its obligations, associated with the lease of Equipment under this Lease Agreement;

(6) retake (by Lessor, independent contractor, or by requiring Lessee to assemble and surrender the Equipment in accordance with the provisions of Section 7 hereinabove) possession of the Equipment without terminating the Lease Schedule or the Lease Agreement free from claims by Lessee which claims are hereby expressly waived by Lessee;

(7) require Lessee to deliver the Equipment to a location designated by Lessor;

(8) proceed by court action to enforce performance by Lessee of its obligations associated with any Lease Schedule and/or this Lease Agreement; and/or

(9) pursue any other remedy Lessor may otherwise have, at law, equity or under any statute, and recover damages and expenses (including attorneys' fees) incurred by Lessor by reason of the Event of Default.

Upon repossession of the Equipment, Lessor shall have the right to lease, sell or otherwise dispose of such Equipment in a commercially reasonable manner, with or without notice, at a public or private sale. Lessor's pursuit and enforcement of any one or more remedies shall not be deemed an election or waiver by Lessor of any other remedy. Lessor shall not be obligated to sell or re-lease the Equipment. Any sale or re-lease may be held at such place or places as are selected by Lessor, with or without having the Equipment present. Any such sale or re-lease, may be at wholesale or retail, in bulk or in parcels. Time and exactitude of each of the terms and conditions of this Lease Agreement are hereby declared to be of the essence. Lessor may accept past due payments in any amount without modifying the terms of this Lease Agreement and without waiving any rights of Lessor hereunder.

**18. COSTS AND ATTORNEYS' FEES:** In the event of any default, claim, proceeding, including a bankruptcy proceeding, arbitration, mediation, counter-claim, action (whether legal or equitable), appeal or otherwise, whether initiated by Lessor or Lessee (or a debtor-in-possession or bankruptcy trustee), which arises out of, under, or is related in any way to this Lease Agreement, any Lease Schedule, or any other document, agreement or instrument executed pursuant hereto or in connection herewith, or any governmental examination or investigation of Lessee, which requires Lessor's participation (individually and collectively, the "Claim"), Lessee, in addition to all other sums which Lessee may be called upon to pay under the provisions of this Lease Agreement, shall pay to Lessor, on demand, all costs, expenses and fees paid or payable in connection with the Claim, including, but not limited to, attorneys' fees and out-of-pocket costs, including travel and related expenses incurred by Lessor or its attorneys.

**19. LESSOR'S PERFORMANCE OPTION:** Should Lessee fail to make any payment or to do any act as provided by this Lease Agreement, then Lessor shall have the right (but not the obligation), without notice to Lessee of its intention to do so and without releasing Lessee from any obligation hereunder to make or to do the same, to make advances to preserve the Equipment or Lessor's title thereto, and to pay, purchase, contest or compromise any insurance premium, encumbrance, charge, tax, lien or other sum which in the judgment of Lessor appears to affect the Equipment, and in exercising any such rights, Lessor may incur any liability and expend whatever amounts in its absolute discretion it may deem necessary therefor. All sums so incurred or expended by Lessor shall be due and payable by Lessee within ten (10) days of notice thereof.

**20. QUIET POSSESSION AND INSPECTION:** Lessor hereby covenants with Lessee that Lessee shall quietly possess the Equipment subject to and in accordance with the provisions hereof so long as Lessee is not in default hereunder; provided, however, that Lessor or its designated agent may, at any and all reasonable times during business hours, enter Lessee's premises for the purposes of inspecting the Equipment and the manner in which it is being used.

**21. ASSIGNMENTS:** This Lease Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Lessee, however, shall not assign this Lease Agreement or sublet any of the Equipment without first obtaining the express prior written consent of Lessor and its assigns, if any. If express prior written consent for either an assignment or change of control, defined as any of the events in section 16(5), is not provided by Lessor, Lessee shall purchase the Equipment from Lessor, in consideration for: (i) the greater of either the Equipment's retail in-place value or the Casualty Loss Value; plus (ii) all amounts then due and owing (including late fees and taxes); plus (iii) the present value of all future Monthly Lease Charges for the Initial Term or any renewal term thereafter discounted at a rate of three (3) percent. The sum of (i), (ii) and (iii) shall be payable at the close of the transaction requiring Lessor's consent, and the Lessor shall transfer the ownership of the Equipment to Lessee and terminate the Lease Agreement. Lessee acknowledges that the terms and conditions of this Lease Agreement have been fixed in anticipation of the possible assignment of Lessor's rights under this Lease Agreement and in and to the Equipment as collateral security to a third party ("Assignee" herein) which will rely upon and be entitled to the benefit of the provisions of this Lease Agreement. Lessee agrees to provide Lessor or its potential assigns with Lessee's most recent audited and its most current financial statements. Lessee agrees with Lessor and such Assignee to recognize in writing any such assignment within fifteen (15) days after receipt of written notice thereof and to pay thereafter all sums due to Lessor hereunder directly to such Assignee if directed by Lessor, notwithstanding any defense, set-off or counterclaim whatsoever (whether arising from a breach of this Lease Agreement or not) that Lessee may from time to time have against Lessor. Upon such assignment, the Lessor shall remain obligated to perform any obligations it may have under this Lease Agreement and the Assignee shall (unless otherwise expressly agreed to in writing by the Assignee) have no obligation to perform such obligations. Any such assignment shall be subject to Lessee's rights to use and possess the Equipment so long as Lessee is not in default hereunder.

**22. SURVIVAL OF OBLIGATIONS:** All covenants, agreements, representations, and warranties contained in this Lease Agreement, any Lease Schedule, or in any document attached thereto, shall be for the benefit of Lessor and Lessee and their successors, any assignee or secured party. Further, all covenants, agreements, representations, and warranties contained in this Lease Agreement, any Lease Schedule, or in any document attached thereto, shall survive the execution and

delivery of this Lease Agreement and the expiration or other termination of this Lease Agreement.

**23.  CORPORATE AUTHORITY:**  The parties hereto covenant and warrant that the persons executing this Lease Agreement and each Lease Schedule on their behalf have been duly authorized to do so, and this Lease Agreement and any Lease Schedule constitute a valid and binding obligation of the parties hereto.  The Lessee will, if requested by Lessor, provide to Lessor, Certificates of Authority naming the officers of the Lessee who have the authority to execute this Lease Agreement and any Lease Schedules attached thereto.

**24.  LANDLORDS' AND MORTGAGEES' WAIVER:**  If requested, Lessee shall furnish waivers, in form and substance satisfactory to Lessor, from all landlords and mortgagees of any premises upon which any Equipment is located.

**25.  MISCELLANEOUS:**    This Lease Agreement, the Lease Schedule(s), attached riders and any documents or instruments issued or executed pursuant hereto will have been made, executed and delivered in, and will be governed by the internal laws (as opposed to conflicts of law provisions) and decisions of, the State of Minnesota.  Lessee and Lessor consent to jurisdiction of any local, state or federal court located within Minnesota.  Venue will be in Minnesota and Lessee hereby waives local venue and any objection relating to Minnesota being an improper venue to conduct any proceeding relating to this Lease Agreement.  At Lessor's sole election and determination, Lessor may select an alternative forum, including arbitration or mediation, to adjudicate any dispute arising out of this Lease Agreement.    THE PARTIES HERETO, AFTER CONSULTING (OR HAVING HAD AN OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING RELATING TO THIS LEASE, INCLUDING     ANY     LITIGATION     REGARDING     THE ENFORCEMENT    OF    THIS    LEASE    OR    ANY    RELATED AGREEMENT.

This Lease Agreement was jointly drafted by the parties, and the parties hereby agree that neither should be favored in the construction, interpretation or application of any provision or any ambiguity.  There are no unwritten or oral agreements between the parties.    This Lease Agreement and associated Lease Schedule(s) constitute the entire understanding and agreement between Lessor and Lessee with respect to the lease of the Equipment superseding all prior agreements, understandings, negotiations, discussions, proposals, representations, promises, commitments and offers between the parties, whether oral or written.  No provision of this Lease Agreement or any Lease Schedule shall be deemed waived, amended, discharged or modified orally or by custom, usage or course of conduct unless such waiver, amendment or modification is in writing and signed by an officer of each of the parties hereto.  If any one or more of the provisions of this Lease Agreement or any Lease Schedule is for any reason held invalid, illegal or unenforceable, the remaining provisions of this Lease Agreement and any such Lease Schedule will be unimpaired, and the invalid, illegal or unenforceable

provisions shall be replaced by a mutually acceptable valid, legal and enforceable provision that is closest to the original intention of the parties. Lessee agrees that neither the manufacturer, nor the supplier, nor any of their salespersons, employees or agents are agents of Lessor.

Any notice provided for herein shall be in writing and sent by certified or registered mail to the parties at the addresses stated on page 1 of this Lease Agreement. This Lease Agreement shall not become effective until delivered to Lessor at its offices at Minnetonka, Minnesota and executed by Lessor.  If this Lease Agreement shall be executed by Lessor prior to being executed by Lessee, it shall become void at Lessor's option five (5) days after the date of Lessor's execution hereof, unless Lessor shall have received by such date a copy hereof executed by a duly authorized representative of Lessee.

This Lease Agreement is made subject to the terms and conditions included herein and Lessee's acceptance is effective only to the extent that such terms and conditions are consistent with the terms and conditions herein.  Any acceptance which contains terms and conditions which are in addition to or inconsistent with the terms and conditions herein will be a counter-offer and will not be binding unless agreed to in writing by Lessor.

The terms used in this Lease Agreement, unless otherwise defined, shall have the meanings ascribed to them in the Lease Schedule(s).

**26.  REPOSSESSION:**    LESSEE  ACKNOWLEDGES  THAT, PURSUANT TO SECTION 17 HEREOF, LESSOR HAS BEEN GIVEN THE RIGHT TO REPOSSESS THE EQUIPMENT SHOULD LESSEE BECOME IN DEFAULT OF ITS OBLIGATIONS HEREUNDER. LESSEE HEREBY WAIVES THE RIGHT, IF ANY, TO REQUIRE LESSOR TO GIVE LESSEE NOTICE AND A JUDICIAL HEARING PRIOR TO EXERCISING SUCH RIGHT OF REPOSSESSION.

**27.  NET LEASE:**  This Lease Agreement is a net lease and Lessee's obligations to pay all Lease Charges and other amounts payable hereunder shall be absolute and unconditional and, except as expressly provided herein, shall not be subject to any: (i) delay, abatement, reduction, defense, counterclaim, set-off, or recoupment; (ii) discontinuance or termination of any license; (iii) Equipment failure, defect or deficiency; (iv) damage to or destruction of the Equipment; or (v) dissatisfaction with the Equipment or otherwise, including any present or future claim against Lessor or the manufacturer, supplier, reseller or vendor of the Equipment.  To the extent that the Equipment includes intangible (or intellectual) property, Lessee understands and agrees that: (i) Lessor is not a party to and does not have any responsibility under any software license and/or other agreement with respect to any software; and (ii) Lessee will be responsible to pay all of the Lease Charges and perform all its other obligations under this Lease Agreement despite any defect, deficiency, failure, termination, dissatisfaction, damage or destruction of any software or software license. Except as expressly provided herein, this Lease Agreement shall not terminate for any reason, including any defect in the Equipment or Lessor's title thereto or any destruction or loss of use of any item of Equipment.

**28.  HEADINGS:**  Section headings herein are used for convenience only and shall not otherwise affect the provisions of this Lease Agreement.

IN  WITNESS  WHEREOF,  the  parties  hereto  have  caused  this  Lease  Agreement  to  be  signed  by  their  respective  duly  authorized representative.

| **Every Term is Agreed to and Accepted:**<br>**FARNAM STREET FINANCIAL, INC.** | **Every Term is Agreed to and Accepted:**<br>**SG BLOCKS, INC.** |
|---|---|
| By: _Steven C Mogan (signature)_ | By: _Paul M Galvin (signature)_ |
| Print Name: _Steven C Mogan_ | Print Name: _Paul M Galvin_ |
| Title: _President_ | Title: _CEO_ |
| Date: _Oct. 28, 2021_ | Date: _10/26/21_ |

v.010616

# EXHIBIT B

OCT 2 8 2021

## LEASE SCHEDULE NO. 001

This Lease Schedule is issued pursuant to the Lease Agreement Number SG101321 dated October 13, 2021. The terms of the Lease Agreement and serial numbers contained on Certificate(s) of Acceptance are a part hereof and are incorporated by reference herein.

**LESSOR**
Farnam Street Financial, Inc.
5850 Opus Parkway, Suite 240
Minnetonka, MN 55343

**LESSEE**
SG Blocks, Inc.
17 State Street, 19th Floor
New York, NY 10004

**SUPPLIER OF EQUIPMENT**
Various

**LOCATION OF EQUIPMENT**
Various

Initial Term of Lease from Commencement Date: 24 Months
Monthly Lease Charge: $83,528.00
Anticipated Delivery and Installation: October 2021 – January 2022
Projected Commencement Date: February 1, 2022
Security Deposit: Upon Lessee's execution of this Lease Schedule, Lessee shall deliver a security deposit in the amount of $167,056.00. Provided that there has been no event of default and Lessee has returned all of the Equipment under this Lease Schedule per the terms of the Lease Agreement, this security deposit will be returned to Lessee.

## EQUIPMENT

| MANUFACTURER | QTY | MACHINE/MODEL | EQUIPMENT DESCRIPTION (including features) |
|---|---|---|---|
| Various | | | Containers, Manufacturing, Medical, IT and other |

The cost of all the Equipment on this Lease Schedule shall total $2,000,000.00. The Monthly Lease Charge listed above is calculated based on the agreement that this cost will be comprised of $2,000,000.00 of hardware at a lease rate factor of 0.041764 per $1.00 and $0.00 of non-hardware costs at a lease rate factor of 0.047459 per $1.00. Should the total cost of the Equipment exceed that indicated above, Lessor and Lessee agree that the Monthly Lease Charge above will be increased to reflect this additional cost at the Installation Date of the additional Equipment. If the total cost of non-hardware exceeds that indicated above, the hardware portion of the commitment above will be increased dollar for dollar by the amount of the additional non-hardware. This Lease Schedule No. 001 will Commence on the first of the month following the later of (i) the date the Lessee has satisfied its commitment to install all of the Equipment, as described above; or (ii) Lessor's receipt of Lessee's executed commencing Lease Schedule; however, Lessor may, at its sole discretion, close and Commence this Lease Schedule at an earlier date. A revised Lease Schedule No. 001R to replace this Lease Schedule No. 001 shall be executed by both parties to reflect the actual Equipment cost accepted and the commensurate Monthly Lease Charge, including any adjustments required under the Monthly Lease Charge Adjustment Rider. The Monthly Lease Charge will be prorated and charged as interim rent between the Installation Date of each item of equipment, as Lessee indicates on the Certificate(s) of Acceptance, and the Commencement Date. Interim rent due prior to the Commencement Date shall not reduce or offset Lessee's post-Commencement Monthly Lease Charge obligations hereunder.

Every Term is Agreed to and Accepted:
**FARNAM STREET FINANCIAL, INC.**
"LESSOR"

By: _____

Print
Name: Steve C. Mg_

Title: President

Date: Oct. 28, 2021

Every Term is Agreed to and Accepted:
**SG BLOCKS, INC.**
"LESSEE"

By: _____

Print
Name: Paul M Galvin

Title: CEO

Date: 10/26/21